T. J. Philpin, *et al.*, v. Thomas L. McCarty, *County Superintendent of Public Instruction of Ford County.*

1. Sec..16, Art. 2, of the Constitution, *Mandatory.* Sec. 16, art. 2, of the constitution is mandatory, not merely in requiring that the subject-matter of an act shall be clearly expressed in its title, but also in requiring that the act shall contain only one subject. But while this section should be enforced so as to guard against the evils designed to be remedied thereby, it should not be construed narrowly or technically to invalidate proper and needed legislation.

2. Sec. 31, Ch. 72, Laws of 1873, *Valid.* The subject-matter of § 31, ch. 72, of the Laws of 1873, so far as it creates an unorganized county into a municipal township of the county to which it is attached for judicial purposes, is clearly expressed in the latter part of the title to the act, and that subject is not so foreign to the other matter of the act as to justify the court in adjudging it unconstitutional and void.

*Original Proceedings in Mandamus.*

Mandamus, brought in this court by *Philpin* and three others, against *McCarty*, county superintendent of public instruction of Ford county. May 28, 1880, an alternative writ was issued, and directed to the defendant—the body of the writ being as follows:

"Whereas, it has been suggested and made to appear to the court, upon the information and affidavit of T. J. Philpin, J. B. Smyth, Henry W. Crow, and N. B. Adams, that you were the duly elected, and are now the acting superintendent of public schools of Ford county, Kansas, and that they each settled upon and improved a quarter-section of section 16, of township 24, south, of range 32, west, and have ever since resided, and still do reside thereon, which said described section of land is situated in the county of Sequoyah, state of Kansas—which said county is an unorganized county of the state of Kansas, and is attached to the county of Ford, in said state, for judicial and municipal purposes, and was organized as a municipal township of Ford county, state of Kansas, in July, 1879, according to the laws of the State providing therefor; and that on the — day of November, 1879, they caused a petition, signed by thirty-one householders, all of whom were, and twenty-eight of whom are, still residents of said unorgan-

ized county of Sequoyah, attached to the county of Ford, and organized as and forming a municipal township of said county as aforesaid, to be delivered into your hands as superintendent of public schools as aforesaid, praying you that you proceed to have the foregoing described school lands sold according to law—a copy of which said petition is before us—and that at the time the said petition was placed in your hands and filed in your office, you refused, and that you do still refuse, to act upon said petition, as you by law are in duty bound to do; and that by your refusal so to act upon said petition, they are deprived of their right to purchase said school lands so settled upon and improved as aforesaid, at the appraised value as by law provided.

"You are therefore commanded, by and with the advice and consent of the board of commissioners of Ford county, Kansas, to appoint in writing three disinterested residents in the county of Ford, wherein said school lands lie [Sequoyah county,] to appraise the same immediately on the receipt of this writ, or that you show cause," etc.

The defendant duly appeared, and filed a motion to quash the writ, for the reason that it does not state facts sufficient to entitle the plaintiffs to the relief sought; upon which writ and motion the case was submitted. The opinion herein was filed November 9, 1880.

*J. C. Strang, M. W. Sutton,* and *Charles M. Walker,* for plaintiffs:

The defendant claims that § 193 of ch. 92, Compiled Laws 1879, applies to townships of an organized county only; and that if it were not so, it would open the door to great frauds, for it would enable a few designing men in a remote part of an unorganized county to enforce the sale of all the school lands in the whole county. We think not. It takes the same number of petitioners, who must be householders of the township, to get the land sold in a township of the character of Sequoyah as in any other township of a county. It is further provided in § 197 of the same chapter, that "no bid at said sale shall be received for less than the appraised value of said land." This, we think, makes ample provision against fraud, to say nothing of other provisions of this act. First, it must

be an organized township ; second, the appraisers must, under oath, appraise at the real value; third, the appraisement must be at least three dollars per acre. If the said land lie "in a remote part of an unorganized county," and, as intimated, in an unsettled territory, then the investment would be unprofitable, and profit is one of the first and main incentives to fraud. Some municipal townships of organized counties contain several sections of school land, and what is to prevent "a few designing men" from selling the school lands of such township? We cannot see from the argument of defendant's counsel, why the supposed fraud cannot be perpetrated as well in such a township as in a township of the nature of Sequoyah. The perpetration of the fraud rests entirely with the appraisers appointed by the superintendent of public schools, and not with the law ; and the people who own the school fund as well as the land, must take the risk of the honesty of the appraisers, duly appointed. There can be no argument presented against the law that will not apply equally to a township of an organized county and an organized township of the character of Sequoyah ; for by § 31, ch. 72, Laws of 1873, the township of Sequoyah, composed of the unorganized county of Sequoyah, and organized according to § 32 of same chapter, is, to all intents and purposes of the law, a township of Ford county. As to the extent to which this section applies, see Report of Attorney General of Kansas, 1878, pp. 183, 189.

But the only real question raised by defendant is, whether § 31, ch. 72, Laws of 1873, is in conflict with § 16, art. 2, of the constitution of Kansas? The first clause is all that applies in this case. Now is the subject clearly expressed in the title of this act, and is it comprehensive enough to cover the matter found in §§ 31 and 32 of the act? We think it is. The organization of a township can be for no other purpose than to provide for the enforcement of the laws. This principle is so plain that it cannot be disputed. Without the organization, there can be no parties through whom to act in their enforcement, save by mob violence. Sec. 111, ch. 24,

Compiled Laws 1879, provides that there be 1,500 resident inhabitants of a county before an organization may be had. Now how shall the laws be enforced, save by attaching the unorganized county to an organized county? A provision that gives civil power to the officers of the county is certainly germane to the enforcement of the laws in the unorganized county, and is fully comprehended in this title: There is no provision that states what laws are intended by the legislature, whether civil or criminal; and it is therefore fair to suppose that both are meant. How, then, can the law for the sale of school lands be enforced in an unorganized county, except by giving authority to the officers of the organized county to which it is attached, to enforce and carry out the provisions of this act? This act alone renders life and the pursuit of happiness secure in all the unorganized counties of the state. Without it, crime would run riot, and the murderer would no longer need to seek the shades of midnight to wreak his deadly vengeance, or secure his unhallowed gains. Not alone in mountain fastnesses, nor in foreign climes, nor yet in the dense and crowded hordes of criminals that infest our cities, would he whom justice seeks be found; but in the beautiful plains of the western part of our noble state he might revel in the delights of a pleasant home, beautified perhaps by the money taken from his slain victim. Public policy alone would dictate, were it necessary, that this act be upheld.

Again, over a large part of the western end of the state, townships are organized and their officers are acting under the provisions of §§ 31 and 32. Where will litigation end if their acts are not valid? It is one of the principles of law, that the ultimate end to be obtained must be considered in the determination of the constitutionality of an act of the legislature. The ultimate end to be obtained by these sections is, we think, very clearly expressed in the title — *i. e.*, the enforcement of the laws in unorganized counties of the state.

We think that this court, by granting an ordinarily liberal construction of the title of this act, will find it amply comprehensive to cover the provisions of the sections in question.

As there cannot possibly be a greater chance for fraud in the sale of school lands in an organized township composed of an unorganized county than in an organized township of an organized county, and as the law under which Sequoyah becomes one of the townships of Ford county is the only law which makes the existence of its inhabitants tolerable, during the interval between the time when it becomes such a township and when it has a sufficient number of inhabitants to entitle it to a county organization, we submit that it should be declared constitutional and valid, and that the peremptory writ should issue.

*Willard Davis*, attorney general, and *A. B. Jetmore*, for defendant:

1. The only question for consideration in this case is, whether school lands in an unorganized county, attached to an organized county for judicial purposes, may be exposed to sale under § 193, ch. 92, Comp. Laws 1879.

In our judgment, this statute applies only to organized townships proper, and not to an unorganized county attached to an organized county for judicial purposes under the statute of the state. We think the language of said section warrants us in this construction, for it provides that, whenever " twenty householders of any *organized township* in which the land is situated shall petition the superintendent of public schools of *such county*," etc. Now, if this section applies to an unorganized county, it would open a wide door for fraud. It would enable a few designing men in a remote part of an unorganized county to enforce the sale of *all* the school lands of the *whole* county.

The design of this statute evidently is, to place the sale of these lands in the hands of the citizen householders of the township proper, *after its organization* as such. That this was the intention of the legislature in enacting this statute, there can be but little doubt. Any other construction would be against public policy and the best interests of the people.

2. But it is claimed that, by § 31, ch. 72 of Laws of 1873,

the attachment of an unorganized county to an organized county for judicial purposes, constitutes it a municipal township thereof, for *all* purposes, including that of schools. The last proviso of said section would seem to indicate an intention to extend the municipal organization of such unorganized county, for school purposes; and it is claimed if schools are authorized to be established in such unorganized county, it follows that the people thereof should have access to these school lands for such purpose. But we submit this does not necessarily follow. The proceeds of these lands are by the constitution made a perpetual fund, the interest only to be used for the support of the public schools. Said fund is the common property of the whole state, the interest only upon which is distributed to the several county treasurers, and thence to the treasurers of the several districts, in equitable proportion to the number of children resident therein. (Const. of Kas., art. 6, §§ 3, 4.) The whole state, therefore, is interested in these lands, which belong to the state. The township as such has no interest in these lands; and when the statute provides that twenty *householders* of an *organized* township may petition for the sale of said lands, the "householders," and not the *township*, are the instrument to bring the lands into market. And when the legislature designated these "householders" to be of an *"organized"* township, we must conclude it intended *permanent* residents of an *ordinary organized township.* (Const., art. 9; Comp. Laws 1879, ch. 110.) Such a construction certainly would afford greater security to our public school fund. This alone should have a controlling influence in the decision of this case. So sacred is this fund that the people in their constitution have hedged it in so that no ruthless or dishonest hand can ever disturb it. And from our knowledge of the decisions of this court, every presumption and intendment is resolved in favor of preserving this legacy, and, if possible, making it more secure.

3. But although this court may hold that under said § 31, ch. 72, Laws 1873, an unorganized county attached to an organ-

ized county for judicial purposes becomes, *ipso facto*, an organized township for *all* purposes, including that of schools, and that the required number of householders thereof may by petition force said lands into market, yet we submit that said law is in conflict with § 16, art. 2 of the constitution of this state.

From the title of said act it will be seen that § 31, especially the last proviso, which refers to school districts, etc., is not embraced therein, and therefore said section is void. 23 Kas. 499 ; 35 N. Y. 449 ; Cooley's Const. Lim. 148−151.

The opinion of the court was delivered by

BREWER, J.: This is an original action, brought by the plaintiffs against the defendant, who is superintendent of public schools for Ford county, Kansas, to compel him to act upon a petition presented to him by over twenty householders of Sequoyah county, an unorganized county attached to said county of Ford for judicial purposes, to expose for sale certain school land in said Sequoyah county, to wit: A part of section 16, township 24, south, range 32, west, under § 193, ch. 92, Compiled Laws 1879. To the alternative writ, defendant filed a motion to quash, upon which this case is submitted.

The case turns upon the constitutionality of § 31, ch. 72 of the Laws of 1873, for if that be valid, it seems clear that Sequoyah county is, *pro hac vice*, a township of Ford county county. Said section is as follows:

"SEC. 31. That so long as any one of the unorganized counties in the state shall be attached to an organized county for judicial purposes, it shall constitute and form one of the municipal townships thereof, and as such shall be entitled to township officers, and all things pertaining to the rights and privileges of a township, and be subject to the same regulations and liabilities as other townships of such county, and its electors shall be deemed legal electors of the county to which it is attached; and the officers of the county to which it is attached shall have the same powers, and perform the same duties, in reference to such attached county, as they have over the municipal townships of their own county; and such municipal township, created under this act, shall have

power to issue township bonds to the amount of ten thousand dollars, to be used solely for the construction of bridges within such township; said bonds to be issued by a vote of the people, and in manner as prescribed by the laws regulating the sale of bonds and construction of works of internal improvement: *Provided, however,* That in no case shall the taxable property of such unorganized county be liable to be taxed for the construction of county buildings, or making public improvements within such organized county; nor shall its electors have the right to vote on any question involving the location of county seats, erection of county buildings, or making public improvements, or on the election of county officers or representatives within, or for such organized county: *And provided further,* That all such school districts within such unorganized county shall be separately described and numbered by the commissioners of such organized county, who shall appoint a deputy school superintendent for this purpose, and also a deputy county surveyor."

No question is made of the power of the legislature to enact such a statute, but the point of challenge is in the title to the act in which this section is found. The question is, is § 31, of ch. 72 of Laws of 1873, as quoted, in conflict with § 16, art. 2, of the constitution of Kansas? Said section of the constitution provides : "No bill shall contain more than one subject, which shall be clearly expressed in its title, and no law shall be revived or amended, unless the new act contain the entire act revived, or the section or sections amended, and the section or sections so amended shall be repealed." The first clause is all that applies in this case. The act in question is entitled "An act to amend sections thirteen, twenty-five, thirty-one, fifty-two, fifty-seven, sixty-six, and seventy-three, of chapter twenty-four, of the General Statutes of Kansas, and providing for the enforcement of the laws and the preservation of the peace in unorganized counties of the state of Kansas." Now, is the subject clearly expressed in the title of this act, and is it comprehensive enough to cover the matter found in § 31?.

The title to said chapter 24 is, "An act defining the boundaries of counties"— every section in that act, except sections 1 and 81, relating exclusively and directly to county

boundaries. Sec. 1 divides the state into counties and gives their names, while § 81 contains certain provisions for the organization of unorganized counties. The several sections of this act named in the title and amended by the act of 1873, refer exclusively to county boundaries. This latter act also contains sections defining the boundaries of twenty-two additional counties. It further contains the section quoted and two or three more of kindred import. Now, that this § 31 comes within the scope of the latter part of the title, is clear. The very substance is the means of executing the law. It enacts no new body of laws, but simply provides how the general laws of the state shall be carried into effect in certain counties. It provides the machinery, the organization, the officers. It provisionally organizes unorganized counties into townships, and authorizes the officers of the counties to which they are attached to act in them. It, so to speak, extends the organization of one county into another, and thus provides for enforcing the laws in the latter. Beyond doubt the subject-matter of this section is clearly expressed in the title.

But it may be said (and that is the real point of challenge) that its subject-matter is entirely foreign to that expressed in the first part of the title, which refers solely to the matter of boundaries; in other words, that the act contains more than one subject. It deals with boundaries, and it provides for the enforcement of the laws in unorganized territory. These two are not parts of one subject. As well unite in one act the matter of county boundaries and provisions for enforcing the laws as a whole, or any particular law in all or a single organized county. We have had several cases before us in which the ground of challenge has been that some part of the act referred to matters not expressed in the title, and wherever that has clearly appeared, we have not hesitated to say that the act, so far as it related to such extraneous matters, was unconstitutional and void. Unlike the decisions in some states, but in harmony with the rulings of most and in accord with the spirit and purpose of the constitutional provision, we have held it mandatory, and not simply directory.

26 — 24 KAS.

*Commissioners of Sedgwick County v. Bailey,* 13 Kas. 600; *Prescott v. Beebe,* 17 Kas. 322; *Swayze v. Britton,* 17 Kas. 625; *Davis v. Turner,* 21 Kas. 131; *In re Holcomb,* 21 Kas. 628; *Bowman v. Cockrill,* 6 Kas. 311; *City of Eureka v. Davis,* 21 Kas. 578; *Woodruff v. Baldwin,* 23 Kas. 491; *Shepherd v. Helmers,* 23 Kas. 504; *State, ex rel., v. Bankers' &c., Ass'n,* 23 Kas. 499.

We see no reason to depart from the views expressed in those cases, and hold that said section 16 of art. 2 is mandatory. It is mandatory, not merely in the provision that the subject of the act shall be clearly expressed in the title, but also in that the act shall contain but one subject. Yet this constitutional requirement is not to be enforced in any narrow or technical spirit. It was introduced to prevent a certain abuse, and it should be construed so as to guard against that abuse, and not to embarrass or obstruct needed legislation. That abuse was this: Ofttimes a matter of merit and commanding general confidence was yoked to something unworthy, and by this union the latter was carried through on the strength of the former. This provision was designed to prevent this, to make every measure stand upon its own merits, and to cut off omnibus legislation. Of course, where all the different matters of the bill are clearly expressed in the title, there is no danger of surreptitious legislation, for all are advised by the title of what legislation is proposed. But two measures entirely foreign to each other cannot now be joined in one act. They must be presented separately and a separate vote had upon each. The assent of a majority of each house must be recorded before any proposition passes into a law, and it must be so recorded separately upon each independent proposition. An assent to two independent matters jointly will make neither of them a law. These views are well supported by authority. The constitution of New Jersey thus states the reason for this rule: "To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other." The supreme court of Michi-

1. Sec. 16, art. 2, of the constitution, mandatory.

gan say ( *People v. Mahaney,* 13 Mich. 494 ) : " The practice of bringing together into one bill subjects diverse in their nature and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state." The supreme court of Iowa express the same idea thus ( *State v. County Judge,* 2 Iowa, 282): " The intent of this provision of the constitution was to prevent the union, in the same act, of incongruous matters, and of objects having no connection, no relation." Cooley, in his work on Constitutional Limitations, p. 143, uses this language: "It may therefore be assumed as settled, that the purpose of these provisions was, first, to prevent *hodge-podge,* or 'logrolling' legislation." And again, p. 146 : "There has been a general disposition to construe the constitutional provision liberally, rather than to embarrass legislation by a construction whose strictness is unnecessary to the accomplishment of the beneficial purposes for which it has been adopted." Many cases might be cited showing the disposition of courts to uphold legislation, which perhaps might technically conflict with this constitutional provision, where it is evident that the real wrongs sought to be remedied did not exist. Thus under a title, "An act for the more uniform doing of township business," provisions for the organization of townships were sustained ; ( *Clinton v. Draper,* 14 Ind. 295.) An act to incorporate a railroad company may authorize counties to subscribe to its stock, or otherwise aid in the construction of the road ; ( *Supervisors v. People,* 25 Ill. 181.) The organization and sitting of courts in new counties is within the scope of an act entitled " An act to authorize the formation of new counties and to change county boundaries ; " ( *Brandon v. The State,* 16 Ind. 197.) But it is scarcely necessary to multiply citations. The rule is one which commends itself to the good sense of all.

Now in the case at bar, there is no private or special

legislation, nothing which would promote personal or local interests, or would prompt the friends of independent measures to unite those measures to avoid opposition to them separately. The legislation is general, and in reference to matters in which the state as a whole is interested. It contains neither contract nor appropriation. It favors no locality and confers no benefits, save as it assures peace and law on the frontier. If any act is general in its scope, this is. If any could be induced by a simple desire for the public good, this was.

Again, the act combines the division of the state into counties and the definition of their boundaries with general provisons for enforcing the laws in such of those counties as are as yet unorganized. These provisions are, that for certain purposes the unorganized shall be deemed parts of the organized counties. *Pro hac vice*, the boundaries of the latter are enlarged so as to include the former. It is tantamount to this: one part of the statute gives the territorial boundaries; the other provides what shall be, for certain purposes, the legal boundaries. It is not a very broad construction to say that the entire act relates to county boundaries; at least so far as the special clauses affecting the case in hand. It may be there are some details or particular clauses which do not come within this description. But for this case the section simply provides that the legal boundaries of Ford county shall for school purposes include Sequoyah county, and that the citizens of the latter shall have the benefit of all the school laws as fully and in the same manner as though they were within the territorial limits of the former county. It is true the section goes much into detail, but the effect, the sum and substance of it, is as stated. And in constitutional questions at least, we must always reach for the substance rather than the form.

We do not think it material that this section is in an amendatory act. This is not like the case of *The State, ex rel., v. Bankers', &c., Ass'n*, supra, where the title limited the

change to certain specific sections, and therefore impliedly excluded other matters. Here the title notifies that certain sections are to be amended, and this further matter introduced. It is therefore as though it were part of the original act, with the title to that enlarged by the latter portion of the title to the amending act.

Finally, it should be noticed that this act has been on the statute book for over seven years, unchallenged; that under it the laws have been enforced, proceedings had, judgments rendered, and rights acquired, through the whole western portion of the state. To overthrow it now would work great hardship. And while this does not conclude the matter, yet this general recognition of its validity is an argument of weight in favor of its constitutionality. We are not disposed to undervalue the argument against the section, or limit the force of the constitutional provision, nor do we assert that this section is clearly constitutional; but for the reasons above given, we think it can be upheld, and that the very doubt should be resolved in its favor.

2. Sec. 31, ch. 72, Laws of 1873, valid.

The prayer of the petitioners will be granted, and the mandamus issued.

All the Justices concurring.