## No. 36,824

THE STATE OF KANSAS, ex rel. EDWARD F. ARN, Attorney General, *Plaintiff*, v. THE STATE COMMISSION OF REVENUE AND TAXATION, William L. Ljungdahl, Chairman, Mark Bennett, and Dale A. Fisher, Commissioners, Bert E. Mitchner, Director of Revenue; THE STATE HIGHWAY COMMISSION OF KANSAS, Harold K. Snider, Commissioner First Division, Adrian M. Smith, Second Division, Charles L. Cushing, Third Division, Roy W. Cox, Fourth Division, Kirke W. Dale, Fifth Division and Acting Director of Highways (Successor to D. J. Fair, deceased); J. C. Berryman, Sixth Division; RICHARD T. FADELY, State Treasurer, etc.; and GEORGE ROBB, State Auditor, etc., *Defendants*.

(181 P. 2d 532)

Opinion filed June 7, 1947.

*A. B. Mitchell,* of Topeka, argued the cause, and *Edward F. Arn,* attorney general, and *Harold R. Fatzer,* assistant attorney general, were with him on the briefs for the plaintiff.

*Stanley Taylor,* of El Dorado, argued the cause, and *Mason Mahin,* of Smith Center, and *Clarence V. Beck,* of Emporia, were with him on the briefs for the defendants.

The opinion of the court was delivered by

HARVEY, C. J.: This is an original proceeding in quo warranto challenging the authority of the state commission of revenue and taxation, the state highway commission, the state treasurer and state auditor, to execute in their respective capacities chapters 271 and 272, Laws of 1945 (being respectively articles 18 and 17 of G. S. 1945 Supp. ch. 68). The petition questions the constitutionality of the legislative acts and the validity of the action and

proposed procedure of defendants thereunder. These are companion acts passed by the same legislature and approved the same day.

The passage of these acts was prompted by an act of Congress known as the "Federal-Aid Highway Act of 1944" (Public Law 521, ch. 626, 78th Congress, 2d Session, approved December 20, 1944). By this act Congress outlined its federal-aid highway program for a three-year postwar period. It was designed to overcome deficiencies in the road system, catch up on construction and reconstruction deferred during the war period, and meet the nation's anticipated transportation requirements. It anticipated the biennial sessions of forty-five states would be held in 1945 so that the states could know the extent of federal aid and make provision for meeting the requirements of the federal government. It continued the principle of federal aid by allocating funds to the states to be matched by state funds to be administered by the Public Roads Administration coöperating with the several states. It established a more definite classification of road systems so that improvements could be made on a selective basis to meet transportation needs, and it took into consideration the employment situation likely to exist after the war and the needs of men returning from military service. The first section redefined the term "construction," as applied to highways so as to include supervising, inspecting, actual building, and all expenses incident to the construction or reconstruction of a highway, including locating, surveying, mapping, and costs of rights of way. It defined the term "urban area" as an area including and adjacent to a municipality of five thousand or more, the boundaries of the area to be fixed by the state highway department in each state, subject to the approval of the Public Roads Administration; and the term "rural areas" as meaning all areas of the state not included in urban areas. It also defined the term "secondary and feeder roads" to mean roads in rural areas, including farm-to-market roads, rural-mail routes and school-bus routes not in the federal-aid system. It appropriated the sum of $1,500,000,000 to become available at the rate of $500,000,000 per year for each of three successive "postwar fiscal years," which term was defined. Of this sum $225,000,000 was made available for projects on the federal-aid highway system; $150,000,000 for projects on the principal secondary and feeder roads, including farm-to-market roads, rural free delivery mail and public-school bus routes, to "be expended on a system of such roads selected by the state highway

242

departments in coöperation with the county supervisors, county commissioners, or other appropriate local road officials and the Commissioner of Public Roads"; and $125,000,000 for projects on the federal-aid highway system in urban areas. Provision was made for allocating the sums appropriated among the several states. The act provides that the share to be paid by the federal government on account of any project shall not exceed fifty percent of the construction cost, exclusive of rights of way, nor exceed one-third of the cost of the rights of way. It is further provided that to expedite the project the Commissioner of Public Roads may advance to a state funds from the federal share of the cost to enable the state highway department to make prompt payments for work as it progresses. "The funds so advanced shall be deposited in a special trust account by the state treasurer . . . to be disbursed solely upon vouchers approved by the state highway department for work actually performed in accordance with plans, specifications, and estimates approved by the Public Roads Administration under the provisions of the act." Provision was made authorizing the Commissioner of Public Roads to enter into appropriate agreements with the state highway commission to carry out the purposes of the act.

Chapter 272, *supra*, provides for the designation of a system of roads to "be known as the secondary road system, including farm-to-market roads selected in accordance with the provisions of this act, rural mail routes and school bus routes not on the state highway system, the construction, reconstruction and maintenance of which shall be under the jurisdiction of the board of county commissioners of each county." The act fixes the mileage of the system in the state and provides the method of selecting the roads which make up the system. Existing county and township roads which previously had been approved by the federal government as being eligible for participation in federal aid funds would become a part of the system. Additional roads making up the system were to be determined by the county commissioners with the concurrence of the state highway commission.

By chapter 271, *supra*, the legislature sought to take advantage of the "Federal-aid Highway Act of 1944." It specifically found that as a result of the war and consequent wartime restrictions on man power, materials and supplies and the depleted highway revenues due to tire and gasoline rationing and other causes, serious

doubt existed whether future revenues from present sources would be sufficient to meet the state's requirement for matching federal aid in the first three-year war period, and that provision should be made to enable the state and its subdivisions to take advantage of and participate in the three-year postwar highway program outlined by the federal act; and for the purpose of declaring the policy of the state to participate in that postwar program and to eliminate doubts as to the ability of the state to match federal aid funds for that program, the legislature created a second highway anticipation fund to supplement funds otherwise available with which to pay revenue anticipation warrants issued and sold for the purpose of obtaining funds with which to match the federal aid for the state and its subdivisions entitled to participate in the federal three-year postwar program. It authorized the state highway commission to enter into all contracts necessary with the Public Roads Administration or other federal agency, and to do and perform acts required by it; to obtain all benefits under the terms and provisions of the Federal-aid Highway Act of 1944; and the state treasurer was authorized to receive, deposit and disburse moneys appropriated to the state and its subdivisions, as provided by the federal act. In order to enable the state and its designated subdivisions to participate in and to receive the full benefit of the funds available or made available under the federal act, and in particular to receive the federal aid for the construction, improvement and reconstruction of highways on the federal aid system, secondary and feeder roads in rural areas, including farm-to-market roads, rural mail routes and school-bus routes not on the federal aid system, urban and rural areas, the state highway commission was authorized to take all steps and proceedings and to make and enter into all contracts and agreements necessary or incidental to the performance of its duties in that respect, which acts or contracts should be approved by the governor of the state before the same became effective. It further provided that for the purposes stated the state highway commission, upon affirmative vote of a majority of the state highway commissioners, might issue and sell to the highest and best bidder, at not less than par, revenue anticipation warrants, and might use the funds derived therefrom for the purposes stated in the act; but no warrants should be issued unless and until the governor and the commission should find and publish such finding in the official state paper that (a) moneys in the highway fund available to match

such federal aid have been fully used for that purpose, and (b) that additional postwar federal aid funds were available for matching and no state funds in the highway fund were available to match the federal aid. A date was fixed for the expiration of authority to issue such warrants, and it was provided that the money realized from the sale of such warrants should be paid into the state treasury to the credit of a fund known and designated as the "Second Highway Anticipation Fund," and the moneys paid into the fund were appropriated for the use set out in the act. A limitation was placed upon the amount of the warrants which could be issued, and provision was made for keeping a proper record of such warrants and for their payment. It was specifically provided that the money derived from the sale of such warrants should be used to match federal aid for projects on the federal-aid highway system and secondary and feeder roads in rural areas, including farm-to-market roads, rural free-delivery mail and public school-bus routes, and urban and rural areas, as defined in the Federal-aid Highway Act of 1944. The act imposed a tax in addition to those imposed by chapter 79, article 34, G. S. 1943 Supp., upon motor vehicle fuels and fuels, as (a) a tax of one cent per gallon or fraction thereof on the use, sale or delivery of all motor vehicle fuels, as defined in G. S. 1943 Supp. 79-3401, used, sold or delivered in this state for any purpose whatsoever; and (b) a tax of one cent per gallon or fraction thereof on all users of fuel, as the term is defined in G. S. 1943 Supp. 79-3433. It provided for the collection of these taxes by the director of revenue, who should daily deposit the tax collected with the state treasurer, who should place three percent thereof in the revenue administration fee fund designated and established by G. S. 1943 Supp. 74-2421, and the remainder of the tax collected in the fund created by the act known as the second revenue anticipation warrant retirement fund. This fund was to be used by the state tax commission to match federal-aid funds under the Federal-aid Highway Act of 1944 until such warrants should be issued as provided in the act, and thereafter used exclusively for the payment of (a) interest on such warrants, (b) the fiscal agency charges, (c) the payment of the warrants as they would fall due or as they might be called for payment, and (d) other necessary expenses incidental to the authority granted by the act. A date was fixed when the tax imposed would become effective, and a limitation was fixed upon the time for which it would continue in force.

It was further provided that when the state highway commission should have created obligations by contract or otherwise, pursuant to the provisions of the act or any existing authority, the tax levied and imposed by the act should not be repealed or amended so that the aggregate of revenues derived would be insufficient to pay the principal, interest, expenses and retirement of the revenue anticipation warrants issued under the provisions of the act, and that the obligations incurred under the act should constitute a first lien upon all the revenues derived under the act and be deposited in the secondary revenue anticipation warrant retirement fund. The act provided for an equitable allocation of the funds to the respective highway districts in equal amounts, as nearly as practicable, and that the state highway commission should construct the highways to be improved under the Federal-aid Highway Act of 1944 in such manner as would equally distribute, as nearly as practicable, the benefits and highway improvements among the respective counties of the state.

Other provisions of the act might be noted, but it seems clear from the wording of the act as a whole and its several provisions that the legislature made a sincere effort to make provision to take advantage of the Federal-aid Highway Act of 1944 in such a way that the authority granted to the state highway commission would not be abused, and that the state and its respective subdivisions would receive the full benefit both of the Federal-aid Highway Act of 1944 and of our state laws.

In the petition plaintiff pleads the enactment of chapters 271 and 272, Laws of 1945, names as defendants all the state commissions and officers charged with the duty of enforcing those statutes, and alleges that unless enjoined from doing so defendants will undertake to carry out the provisions of the statutes, and further alleges that the statutes are unconstitutional and void for the following reasons:

That chapters 271 and 272 violate sections 9 and 10 of article 11 of our constitution, (1) by compelling the expenditure of funds on streets and highways not a part of the state highway system; (2) by providing for the issuance of "tax anticipating warrants" which would, in effect, be bonds of the state of Kansas, and (3) by requiring the collection of a one cent gasoline tax on all gasoline whether used for highway or nonhighway purposes.

That chapters 271 and 272 violate the equal protection clause of the 14th amendment of the United States constitution and the uni-

form tax provision of section 1, article 11, of the constitution of Kansas, by creating an illegal, unjust and unequal burden on various classes of taxpayers, as follows: (*a*) Farmers and others who burn gasoline motor fuel for nonhighway uses are required to pay the tax while farmers and others who use coal, diesel oil, alcohol, or other fuel for nonhighway motor purposes do not pay such tax; (*b*) nonhighway users are taxed for highway purposes and highway users burning tax-exempt motor fuels or no fuel at all use the highways without paying any tax; (*c*) city dwellers and others who do not use the state highways for any purpose, but use their vehicles principally or entirely on streets and roads constructed and maintained from the proceeds from the general property tax, are required under existing law to pay four cents per gallon for state highway use tax for the benefit of highways they have little or no use for, which constitutes them a class illegally discriminated against; (*d*) many persons are unable by reason of their residence or occupation to purchase or use any tax-exempt gasoline but pay four cents per gallon for all their motor fuel, while others, with the apparent knowledge and implied consent of defendants, pay only one cent per gallon tax for motor vehicle fuel.

That the tax anticipation warrants issued as provided in chapter 271 will create a debt in excess of $1,000,000 without a vote of the people, in violation of sections 6 and 7 of article 11 of our constitution.

That chapter 271, which requires vendors of motor fuel to collect the tax from purchasers and remit the same without compensation for such service, subjects such persons to involuntary servitude, in violation of section 6 of the bill of rights of our constitution.

That the title of chapter 271 does not clearly express the subject matter contained in the act, and that the act contains more than one subject, in violation of section 16, article 2, of our constitution.

Defendants by their answer admitted the facts alleged, but specifically denied the legal conclusions alleged in the petition.

The petition and the answer contain allegations respecting the procedure taken or contemplated by defendants under the act and the amount of tax collected and the use being made of it. These matters will be discussed later.

We turn now to the questions raised as to the validity of chapters 271 and 272, Laws of 1945. Sections 9 and 10 of article 11 of our constitution read:

"Sec. 9. The state shall never be a party in carrying on any work of internal improvement except that it may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor bonds issued by the state for such highways.

"Sec. 10. The state shall have power to levy special taxes, for road and highway purposes, on motor vehicles and on motor fuels."

It is argued that the statutes in question violate these constitutional provisions by compelling the expenditure of funds on streets and highways not a part of the state highway system. By a statute originally enacted in 1927 (Laws 1927, ch. 255, sec. 6, and several times amended and now appearing as G. S. 1945 Supp. 68-406) the state highway commission was authorized to designate and improve "a state highway system" consisting of not more than 10,000 miles. Counsel for plaintiff argue that the state highway system so established is synonymous with the words "a state system of highways" used in our constitution (sec. 9, above quoted), and in effect argue that having established a state highway system, with a limited number of miles, it has no authority to establish an additional secondary road system, as it attempted to do in chapter 272, *supra*. The point is not well taken. It was held in *Heller v. A. T. & S. F. Rld. Co.*, 28 Kan. 625: "The legislature, as the representative of the public, has plenary power over streets and highways . . ." (syl. ¶ 1). This view has been repeatedly sustained in later decisions of the court which may be found readily from the citator. This accords with the general rule stated in 39 C. J. S. 949, as follows:

"The power to establish highways rests primarily in the legislature which may, subject to constitutional restrictions, delegate it to political subdivisions or local agencies, to be exercised in the manner prescribed."

And in 40 C. J. S. 25, it is said:

"The construction and repair of public roads is a governmental function which may be exercised by the state or delegated to state or local agencies or bodies . . ."

Other authorities on highways are to the same effect.

We think the phrase, "a state system of highways," in our constitution (sec. 9, *supra*) is broad enough to authorize the state to classify all the highways of the state and to provide for their construction and maintenance either by the state or by any of its political subdivisions, or by any combination of them, as it may deem proper. It is well settled that the state, through its legislature, may exercise any governmental powers not granted to federal government and not prohibited by our constitution. (*Jansky v. Baldwin*,

120 Kan. 332, 243 Pac. 302; *Lemons v. Noller,* 144 Kan. 813, 63 P. 2d 177.) Certainly the power authorized to be exercised by the constitutional provision was not exhausted by the establishment of the state highway system under G. S. 1945 Supp. 68-406.

It is argued that the statutes in question violate the constitutional provisions above quoted inasmuch as they provide for issuing tax anticipation warrants which, in effect, would be bonds of the state. This question was fully considered in passing upon the validity of a similar statute in *State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 28 P. 2d 770, where it was specifically held that such warrants are not bonds. We think the reasoning of that case applies here.

It is argued that the statutes in question violate the above constitutional provisions for the reason that in effect they levy a general property tax by requiring the collection of one cent per gallon on all gasoline, whether used for highway or nonhighway uses. We do not regard the use made of it as being controlling. Gasoline is a "motor fuel" upon which a tax may be levied under our constitution (sec. 10, *supra*).

It is argued that the statutes in question create an illegal, unjust and unequal burden on various classes of taxpayers in certain enumerated particulars, in violation of that portion of section 1, article 11, of our constitution, which reads: "The legislature shall provide for a uniform and equal rate of assessment and taxation, . . ." This point was considered and decided adversely to the contention of plaintiff in *State, ex rel., v. Barton County Comm'rs,* 142 Kan. 624, 51 P. 2d 33, where it was said:

"This provision of our Constitution applies exclusively to taxation of property. (*City of Newton v. Atchison,* 31 Kan. 151, 1 Pac. 288.) The motor-vehicle fuel tax is not a tax on property. The act providing for it 'creates no property tax, but is a personal liability upon dealers.' (*State, ex rel., v. Snell,* 127 Kan. 859, 860, 275 Pac. 209.) The same question has been considered by other courts where the constitutional provisions were similar to our own, and the same conclusion reached in the following cases:" (Citing the cases.)

For similar reasons counsel for plaintiff argue that the tax imposed by the statutes in question violates the due process clause of the 14th amendment to the federal constitution. The federal authorities are contrary to that view. In *Carmichael v. Southern Coal Co.,* 301 U. S. 495, 509, it was said:

"It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxa-

tion. [Citing federal cases.] This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation. [Citing federal cases.]

"Like considerations govern exemptions from the operation of a tax imposed on the members of a class. A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it." (Citing federal cases.)

Under this general heading plaintiff alleges several subdivisions: (*a*) Persons who use gasoline as a motor fuel for nonhighway uses are required to pay the tax, while others who use coal, diesel oil, alcohol, or other motor fuels for such purpose do not pay the tax. It may be a sufficient answer to this contention that the constitution (art. 11, sec. 10) specifically authorizes the legislature to tax gasoline. We point out, however, that this constitutional provision was not necessary in order to give the legislature that authority. The state, in its sovereign capacity, has power, through its legislature, to levy excise taxes for revenue purposes, and in fact our legislature had done so before this constitutional amendment was adopted. One may inquire if this is true, why the amendment was submitted to and adopted by the people. Perhaps the reason was that many of our citizens had questioned previous legislative acts levying such a tax, and that it was done to quiet any feeling of that kind. But, irrespective of the reason for it, it must be interpreted in harmony with not only other provisions of the constitution, but with the fundamental, inherent power of the state. This legislative power arises from the fact that our government is one of the people, who act through their legislatures in enacting laws, the only restriction being that the people so acting cannot exercise powers which have been granted to the federal government by the adoption of the federal constitution or limited by our state constitution. Section 10, article 11, is a recognition of an existing power. The legislature needed no grant of such power it had previously exercised, and it is not a limitation of legislative power. The only limitation placed upon the legislature with respect to taxes to raise money for highway purposes is in section 9, article 11, where it is specifically provided that no property tax shall be levied nor bonds issued for that purpose.

(*b*) It is alleged nonhighway users of gasoline are taxed for highway purposes, while users of highways who use some other motor fuel are not taxed. Being an excise tax, that was a matter of legis-

lative selection. The basic rule was well stated in *Fretwell v. City of Troy*, 18 Kan. 271, 274 (opinion by Brewer, J.), as follows:

"Regarded as a tax, therefore, it comes within the general proposition concerning taxation, that it knows no limit other than the necessities of the public treasury, and the discretion of the taxing power."

See, also, *In re Martin*, 62 Kan. 638, 64 Pac. 43; 61 C. J. 154.

(c) It is alleged that persons who do not use the state highways for any purpose, but use their vehicles on streets or roads constructed and maintained by a general property tax are required to pay four cents per gallon, the proceeds to be used for highway purposes for which they have no use; and (d) persons who, by reason of their residence or occupation are unable to purchase or use tax-exempt gasoline, pay four cents per gallon for their motor fuel, while others pay only one cent per gallon. It is difficult to visualize any substantial number of persons who could be so classified, but, assuming there is, we regard the contention as of no consequence. The arguments might have been and probably were presented to and considered by the legislature. It is characteristic of every excise tax that it may apply to some persons and not to others. The fact that it does so does not render the tax invalid. Certainly it presents no constitutional reason for the invalidity of such tax.

It is alleged the tax anticipation warrants authorized to be issued under chapter 271 will create a debt in excess of one million dollars without a vote of the people, in violation of sections 6 and 7 of article 11 of our constitution. Those sections relate to state debts created to be paid by property taxes and have no application to the tax here involved for the reason, as previously pointed out, the obligation created by these warrants is not a debt of the state within the meaning of those sections; it is a lien and charge upon the funds raised by the tax. (*State, ex rel., v. State Highway Comm.*, 138 Kan. 913, 28 P. 2d 770.)

It is alleged chapter 271 requires vendors of motor fuels to collect and to make the tax without compensation, and in doing so subjects them to involuntary servitude, in violation of section 6 of our bill of rights. This section of our bill of rights is tantamount to the 13th amendment of our federal constitution. Respecting that it was said, in *Butler v. Perry*, 240 U. S. 328, 332 (36 S. Ct. 238, 60 L. Ed. 272):

"This amendment was adopted with reference to conditions existing since the foundation of our Government, and the term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery

which in practical operation would tend to produce like undesirable results. It introduced no novel doctrine with respect of services always treated as exceptional, and certainly was not intended to interdict enforcement of those duties which individuals owe to the State, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, not the destruction of the latter by depriving it of essential powers." (Citing cases.)

It is generally recognized that an individual may be required to give services to a state without compensation (*Crews v. Lundquist*, 361 Ill. 193, 197 N. E. 768). Indeed, it is a common practice, both for the federal government and for the state, to call upon citizens to perform some service for the state without compensation.

It is alleged that the title of chapter 271 does not clearly express the subject matter contained in the act and that the act contains more than one subject, in violation of section 16, article 2 of our constitution. The point is not well taken. While the title is perhaps more in detail than necessary, it is not contended that it is misleading.

Having considered all the objections raised to the validity of chapters 271 and 272, Laws of 1945, the court finds that they are free from any constitutional infirmity and that they are valid enactments of the legislature.

The pleadings outline the various steps taken by defendants under these statutes since their enactment, and copies of the forms of the proposals, resolutions and contracts made in carrying out the provisions of the acts are set out. These are too lengthy to embody herein, and perhaps it would serve no good purpose to do so. They appear to be in harmony with the statutes and to provide an effective method of carrying out the intent and purposes of the statutes. No serious contention is made to the contrary.

From what has been said it is clear that judgment should be entered for defendants. It is so ordered.