No. 39,571

THE STATE OF KANSAS, ex rel., HAROLD R. FATZER, Attorney General, *Plaintiff*, v. KANSAS TURNPIKE AUTHORITY, and GALE MOSS, BYRON GOURLEY, O. W. DAVIS, E. BERT COLLARD, ALLEN HODNETT, FRANCIS JACOBS, and WILL TOWNSLEY, Members Thereof, *Defendants*.

(273 P. 2d 198)

Opinion filed July 24, 1954.

*William Paul Timmerman*, assistant attorney general, argued the cause, and *Harold R. Fatzer*, attorney general, was with him on the brief for the plaintiff.

*Gale Moss*, of El Dorado, argued the cause, and was on the brief for the defendants.

The opinion of the court was delivered by

THIELE, J.: This is an original action in quo warranto brought by the state of Kansas on the relation of the attorney general to oust the Kansas Turnpike Authority, hereafter referred to as the Authority, from attempting to exercise the powers and duties purportedly conferred by Laws 1953, Ch. 308, now appearing as G. S. 1953 Supp., 68-2001 to 68-2020 both inclusive, references hereafter being made to the latter under chapter and section number only, for the asserted reasons that the act creating the Authority is unconstitutional.

We need not detail the allegations of the petition nor of the answer of the Authority, it being sufficient to state that they form an adequate basis for the contentions of unconstitutionality as presented in the State's brief and as hereafter discussed. We note that the petition also alleges that certain proceedings of the Authority had under the act are *ultra vires* and not authorized by the act and contentions thereunder are later discussed.

The act under attack consists of twenty sections creating the Authority and fixing its powers and duties. In view of the contentions made by the State, it is not necessary that a detailed review

be made of the statute as attention to specific provisions will be more fully paid in discussing these contentions. In a very summary way it may be said the act bears a long title comprehensive of the contents of the act, and that the act provides for the construction of a specified type of turnpike projects which term includes express highways and toll roads, and that the Authority created is authorized and empowered to construct, maintain, repair and operate such turnpike projects, and to issue revenue bonds of the Authority, payable solely from revenues, to finance such projects; that no project shall be undertaken unless the project and the location thereof have been thoroughly studied with respect to traffic, engineering, cost and financing nor unless such study shows: (a) that public funds for construction are not available; (b) that the construction can be financed wholly through investment of private funds in toll road revenue bonds; and (c) that the project and indebtedness incurred will be entirely self-liquidating through tolls and other income from operation of the project. The Authority created consists of seven members four of whom are appointed by the governor, the other three being the state director of highways, the chairman of the committee on highways of the senate, and the chairman of the committee on roads and highways of the house of representatives. Provision is made for election of its officers by the Authority. The act contains a general grant of power to the Authority which includes the power to adopt bylaws; to sue and be sued; to determine the location, subject to the approval of the state highway commission, of each turnpike project, its design and materials of construction and construct, maintain, repair and operate the same; to issue turnpike revenue bonds payable solely from tolls and revenue pledged for their payment; to fix and revise from time to time and charge and collect tolls for transit over each project; to establish rules and regulations for use of the project; to acquire, hold and dispose of real and personal property in the exercise of its powers and duties; to designate the location and establish points of ingress and egress for each project; to make all contracts necessary or incidental to the performance of its duties; to employ consulting engineers, attorneys, accountants, construction and financial experts and other employees; to accept and receive federal grants in aid of construction of a project and to accept and receive aid or contributions of money, property, labor or other things of value from other sources to be used only for the purpose for which the

grants and contributions may be made and to do all acts and things necessary to carry out powers expressly granted. Many incidental powers are also granted which will be referred to later where necessary. Provision is made for the acquisition of right of way and for over or under passing railroad rights of way. The Authority is empowered to issue turnpike revenue bonds to pay the cost of the projects, the maturity dates and interest rates being limited, the bonds to be of denominations as determined by the Authority which may sell the bonds in such manner and for such price as it may determine will best affect the purposes of the act, and that the proceeds of the bonds shall be used solely to pay the cost of the project. Under 68-2008 it is provided that revenue bonds issued under the act shall not be deemed to constitute a debt of the state or of any political subdivision of the state or a pledge of the faith and credit of the state or any political subdivision of it, but all such bonds shall be payable solely from the funds provided therefor from revenues, and that all revenue bonds shall contain on the face thereof a statement to the effect that neither the state nor the Authority shall be obligated to pay the bonds or interest thereon except from revenues of the project and that neither the faith and credit nor the taxing power of the state or any political subdivision thereof is pledged to the payment of principal or interest on such bonds. By further provision the Authority is authorized to fix, charge and collect tolls and to make contracts for use of right of way for public utilities, filling stations, garages and restaurants and to fix charges for such use, and for the ultimate application of collections made to the retirement of the revenue bonds. The provisions of the statute as to remedies of bondholders, that the Authority shall be exempt from taxation, and that the bonds are eligible for specified investments, need no present notice, nor do other provisions with reference to operation of the project, the restoration and repair of private property, agreements with political subdivisions, annual reports, and restrictions on employees contracting with the Authority. By another section of the act it is provided that when a project has been completed and the bonds have been paid or a sufficient amount for that purpose shall have been set aside in trust for the benefit of the bondholders, the project shall become a part of the state highway system and shall thereafter be maintained by the state highway commission which is given power to fix, revise, charge, and collect

tolls, as more specifically set forth in 68-2017. We note also that under 68-2018 to provide for preliminary expenses of the Authority in carrying out the act the state shall not appropriate any money from the state general fund but shall appropriate such amounts as may be necessary not exceeding $25,000 for any one fiscal year from the state highway fund, and, in effect, be repaid when revenue bonds are sold. The final section of the act makes it unlawful for any person using the turnpike project to fail or refuse to pay the toll provided and fixes the punishment.

The State presents its contentions that the act in question violates our state constitution under ten titles which will be stated in substance as presented by it, and in the same order. Under Title XI the question of claimed *ultra vires* acts of the Authority will be considered. Of necessity there is some overlapping of discussion under the several titles.

I.

Does the act violate Art. II, § 1 of the constitution for the reason it constitutes an unlawful delegation of power?

The above section of the constitution provides that the legislative power of this state shall be vested in a house of representatives and senate. The State directs attention to *Johnston v. City of Coffeyville*, 175 Kan. 357, 264 P. 2d 474, and *State, ex rel., v. Hines*, 163 Kan. 300, 182 P. 2d 865, and argues the act under attack constitutes an improper delegation of legislative powers in that: 1. It fixes no standard for the selection of locations of turnpike projects; 2. The Authority is given uncontrolled discretion in respect to the employment of experts, employees and agents and the fixing of their compensation; 3. It authorizes the issuance of revenue bonds without limitation of the amount thereof, and their sale at public or private sale as the Authority in its discretion may determine; and 4. It authorizes the state highway commission to advance funds for preliminary studies in connection with the construction of a turnpike project without any provision for determining the circumstances under which the money shall be advanced or the extent of the advance. In its brief the State does not present any specific argument on the propositions advanced by it.

We shall not dwell at length on the two decisions last above noted. In the City of Coffeyville case the statute provided for improvement of a county road one-half of which was in the county and one-half of which was in the city, and made detailed specific provision for

assessing the cost of that part lying in the county, but provided that the city should apportion its share "on an equitable ratio among the taxpayers." The city passed an ordinance levying an assessment on an equal front foot basis on lots abutting the road. This court held the ordinance invalid as being beyond the delegated power of the city and as taking property without due process of law, it being said in the opinion that the statute authorizing the improvement did not fix any reasonably clear standard under which the city must act.

The Hines case involved a school district reorganization act. In the course of a long opinion discussion was had of the delegation of legislative power as well as of administrative power, to which reference is made, and it was held that legislative power, as distinguished from administrative power, cannot be delegated unless there is constitutional sanction therefor, and that a delegation of administrative authority must fix a reasonably clear standard which governs the exercise of the authority.

As originally adopted our constitution provided that the state shall never be a party in carrying on any work of internal improvement. The section was amended in 1920 to provide that the state could aid in the construction of roads and highways under conditions no longer of importance and it was further amended in 1928 by adding to the language first used that the state may adopt, construct, reconstruct and maintain a state system of highways but no general property tax shall ever be laid or bonds issued by the state for such highways. After the amendment, statutes were enacted for financing the state highway system and for the issuance of tax anticipation warrants payable solely from excise tax and were considered in *State, ex rel., v. State Highway Comm.*, 138 Kan. 913, 28 P. 2d 770; and for the establishment of the secondary road system and its financing by revenue anticipation warrants, which were considered in *State, ex rel., v. State Commission of Revenue and Taxation*, 163 Kan. 240, 181 P. 2d 532. In each case contentions of unconstitutionality under the above constitutional provision were denied. In the last cited case "state system of highways" was defined, it was said that "The legislature, as the representative of the public, has plenary power over streets and highways" and that under the constitution the state has power to classify all of the highways of the state and to provide for their construction and maintenance. See the discussion under Title III, *infra.*

Without further discussion, we think it clear that as this court

has heretofore approved the construction of that part of the "state system of highways" designated in the statutes as "the state highway system" (G. S. 1949, 68-401 *et seq.*) and the secondary road system (G. S. 1949, 68-1701 *et seq.*) and has recognized that the state legislature may make further classification, and as the State does not now contend to the contrary, we take it as accepted that the legislature had power under the constitution to create the Authority and to empower it to construct turnpike projects. We need not pause to separate any possible delegation of legislative from administrative or executive power, but remark that generally speaking the delegation is of the administrative duty to construct and maintain turnpike projects. Are the State's contentions there is lack of standards sound?

The constitutional provision for highway construction is not self-executing and requires legislative action. It is apparent that the legislature was not in a position to determine positive location of toll roads or turnpikes, the length of a particular project, and cost of right of way, the over-all cost of construction and all the minutia of facts so that it could pass an act in which nothing was left for future determination. A reading of the act passed makes it clear that any project to be constructed is to be self-liquidating and that no funds resulting from any general tax are to be used for construction, operation or maintenance of any project, and that before a project is undertaken it must be determined that when completed it will earn a revenue from tolls and income arising from operation of the project to pay the principal and interest of the revenue bonds to be issued and sold to raise funds to initiate and complete the project. The act makes it clear the legislature was aware that only intensive studies would reveal whether such a project could be constructed from prospective available funds arising from the sale of revenue bonds and whether a project between termini within the state would be financially feasible and would facilitate vehicular traffic. The legislature therefore created the Authority and empowered it to issue revenue bonds payable solely from revenues to pay the cost of a toll road project but it provided that no such project should be undertaken unless and until such project and its proposed location have been thoroughly studied with respect to traffic, engineering cost and financing nor unless the study showed that public funds for construction of a free expressway are not available; that the construction of a toll expressway can be fi-

nanced wholly through investment of private funds in toll road revenue bonds, and that the project and indebtedness therefor will be entirely self-liquidating through tolls and other income from operation of the project. Coupled with the above is a general grant of powers which includes the power to employ consulting engineers, attorneys, accountants and construction and financial experts to make the requisite studies. Further powers granted need no present notice. Without further elaboration we are of the opinion that when the nature and magnitude of the contemplated improvement; the practicality of location of a particular toll road; the feasibility of such a project from a financial standpoint and the over-all cost of such a project to be retired from revenue bonds and other income from operation are considered, that the statute does fix a reasonable standard and guide for the selection of the location of turnpike projects and for the Authority to proceed to construct such a project on the locations selected.

With respect to contentions above stated as to the Authority's employing experts and others and fixing their compensation and issuing bonds and selling the same at public or private sale no separate argument is made by the State. We know of no constitutional impediment. The question is one within the discretion of the legislature, and the question of the wisdom, justice and expediency of the legislation respecting the above is for that body and not for the courts. See discussion on this phase under Title IV, *infra*.

With respect to the State's contention the act authorizes the state highway commission to advance funds to the Authority for preliminary studies without determining the circumstances under which such money shall be advanced or the extent of the advance, we see little that warrants extended discussion. The act states that to provide for preliminary expenses of the Authority the legislature shall not appropriate any moneys from the state general fund but shall appropriate "such amounts as it may deem necessary" not exceeding $25,000 for any one fiscal year "from the state highway fund." There is no grant of power to the Authority—what amount is to be appropriated is retained by the legislature. No constitutional question is involved. And see the discussion in Title V, *infra*.

The Authority, in its brief, directs our attention to decisions from other states wherein validity of statutes with respect to toll roads was upheld. These decisions will not be noted or their constitutional backgrounds discussed for we are of the opinion the matter is

controlled by our own course of decisions, referred to throughout this opinion. The State's contentions under this title cannot be sustained.

## II.

Does the act violate Art. XI, §§ 6 and 7 of the constitution which specifically prohibit the state from contracting a debt unless the proposed law for creating the debt shall be first submitted to a direct vote of the electors of the state?

The argument made under this title is much more limited than its language suggests.

The State in its brief quotes the above constitutional provisions, which need not be set forth at length here. In general they provide that for the purpose of making public improvements the state may contract debts not in excess of one million dollars, and that no debt shall be contracted, except as provided, unless the proposed law shall first be submitted to a direct vote of the electors. The State argues that although the act purports to create the Authority as a body politic and corporate, it is an alter ego of the state; that it may sue and be sued in its own name, and although the act provides bonds issued under it shall not be deemed to constitute a debt of the state, the Authority may be sued and a judgment recovered, which judgment is not by the act made payable solely from the revenues of the Authority and would constitute a debt of the state; that the state, as a sovereign is immune from suit without its consent, (*Hyre v. Sullivan,* 171 Kan. 309, 232 P. 2d 474) but that the act grants the consent of the state to be sued without provision of any funds to pay any judgment which might be recovered, a debt is created without vote of the electors, and thus the constitution is violated. In view of the limited contention made we need not point out that a fundamental distinction has been recognized between "public improvements" covered by the above sections and "works of internal improvement" covered by Art. XI, § 9 of the constitution. See *State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 917, 28 P. 2d 770. In that case the court also considered the effect of provisions in the state highway commission act that the commission was a body corporate with power to sue and be sued, a situation much like that now before us, saying:

. "By our constitutional provision (art. 11, § 8) it is the state which is authorized to construct and maintain a state system of highways. By chapter 225 of the Laws of 1929 the legislature created a highway commission to

perform those state functions and provided funds for that purpose. It declared the commission 'shall be a body corporate, with power to sue and be sued,' thus making it a quasi-corporate body to carry forward the work for the state of constructing and maintaining a state system of highways. (*McCandliss Construction Co. v. Neosho County Comm'rs,* 132 Kan. 651, 296 Pac. 720; *Payne v. State Highway Comm.,* 136 Kan. 561, 16 P. 2d 509.) The state has given its consent to be sued by an action against the state highway commission with respect to contracts it is authorized to make or was required to take over. It also has given its consent to be sued for damages under certain circumstances by an action against the state highway commission. (R. S. 1931 Supp. 68-419.) But the state has not given its general consent to be sued for all purposes. (*Barker v. Hufty Rock Asphalt Co.,* 136 Kan. 834, 18 P. 2d 568.) The state highway commission is therefore acting for the state in all of its activities authorized by statute for the construction and maintenance of state highways. The funds which it uses for that purpose are state funds, and the warrants it draws on the fund are state warrants, payable, however, from the fund, and are general as they apply to this fund." (l. c. 917)

The State's argument does not indicate whether the judgment it states may be recovered is for contract or tort liabilities. Without further discussion we think it may be said that if contract liability is what is meant, the question was laid to rest in the last cited case. If tort liability is meant, it must suffice to say that at no place in the act is there any waiver of the state's immunity.

The State's contention that the creation of the Authority as a body corporate and politic with power to sue and be sued constitutes a waiver of immunity cannot be upheld, and unless it be upheld, there is no basis for a contention that a judgment against the Authority would constitute a debt of the state.

## III.

Does the act violate Art. XI, § 9 of the constitution in that it purports to make the state a party to the construction of a work of internal improvement?

The State directs our attention to the fact it was stated in *State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 919, 28 P. 2d 770, that as originally adopted the above section applied to turnpikes, canals and the like, and that the section had been amended in 1928 to provide the state might adopt, construct, reconstruct and maintain *a state system of highways,* but no general property tax shall ever be laid nor bonds issued by the state for such highways, and it contends that it is apparent from the act that the turnpike project will not be a part of the *state highway system* until all of the bonds issued have been retired as provided by Sec. 17 of the act. The state does not

pursue the matter further, and we find some difficulty in learning its precise contention.

If the argument is predicated on the proposition the terms "state system of highways" and "state highway system" are synonymous, and that the turnpike project must fail unless it is a part of the state highway system, it cannot be sustained. In *State, ex rel., v. State Commission of Revenue and Taxation*, 163 Kan. 240, 181 P. 2d 532, constitutionality of legislation creating the secondary road system was involved. In the course of that opinion reference was made to the fact the state highway commission was authorized to designate and improve "a state highway system" (G. S. 1945 Supp., 68-406) and that it was argued that no authority existed to establish an additional secondary road system, as the attacked legislation attempted. After directing attention to the fact the legislaure had plenary power over highways, the court further said:

"We think the phrase, 'a state system of highways,' in our constitution (sec. 9, *supra*) is broad enough to authorize the state to classify all the highways of the state and to provide for their construction and maintenance either by the state or by any of its political subdivisions, or by any combination of them, as it may deem proper. It is well settled that the state, through its legislature, may exercise any governmental powers not granted to federal government and not prohibited by our constitution. (*Jansky v. Baldwin*, 120 Kan. 332, 243 Pac. 302; *Lemons v. Noller*, 144 Kan. 813, 63 P. 2d 177.) Certainly the power authorized to be exercised by the constitutional provision was not exhausted by the establishment of the state highway system under G. S. 1945 Supp. 68-406." (l. c. 247)

Although not argued by the State we think it clear the legislature had power to create an arm of the state other than the state highway commission to construct a particular type of highway; that the proposed turnpike project is a part of a state system of highways; that its cost is not to be paid by any general property tax nor by bonds to be paid by a general property tax; that it was within the power of the legislature to provide that at a fixed time, the turnpike project will become a part of the state highway system subject to maintenance, operation and control of the state highway commission as the act provides. The State's third contention is not sustained.

## IV.

Does the act violate Art. II, §§ 1 and 3 of the constitution in that it constitutes an unauthorized attempt to confer executive powers upon members of the legislature and to increase their compensation?

Article II, § 1 above referred to states that the legislative power of the state shall be vested in a house of representatives and senate, while § 3 states that members of the legislature shall receive as compensation for their services a stated sum for each day's actual services at regular or special sessions and a sum for expenses to be fixed by law and not to exceed a stated amount per day and travel expenses. Under 68-2003 of the act in question the chairman of the committee on highways of the senate and the chairman of the roads and highways committee of the house are ex-officio members of the Authority, each member of the Authority to receive $25.00 for each day actually spent in the performance of his duties, not exceeding $2,500 in any one year, and to be reimbursed for his actual expenses necessarily incurred in the performance of his duties.

The State's contention is that it is fundamental that all officers who have the appointing power are disqualified for appointment to any office to which they may make appointments (67 C. J. S. pg. 130) and that such a policy is founded upon sound reasoning as it takes away from a legislator any bias or prejudice in his vote (*Meredith, Atty. Gen., v. Kauffman*, 293 Ky. 395, 169 S. W. 2d 37). The State further contends that the legislature cannot interfere with nor exercise any powers properly belonging to the executive department (16 C. J. S. pg. 332) and argues that, if it may appoint two members, it may appoint the full membership of the Authority and that such action would be a clear encroachment of the legislative power upon the executive power. And finally, the State contends that the legislature, by including two of its members as ex-officio members of the Authority, has provided for an increase in their compensation contrary to the constitutional limitation noted, and in connection our attention is directed to *The State v. Dean*, 103 Kan. 814, 176 Pac. 633, where no constitutional question was involved but where it was held to be against public policy for a commission to which the sum of $50,000 was appropriated to carry out the purposes of the act creating the commission, the members of which were to serve without pay, to appoint one of the members as secretary and to fix and pay his salary for services performed under the act.

We first note that there is no provision of our constitution with reference to the power of the legislature to provide that some one or more of its members shall be ex-officio members of a board, com-

mission or other body created by it. That the legislature has so provided in many instances must be conceded. We are not disposed to search for all statutes where it has done so but a list would include the following from G. S. 1949:

20-2201, creating the judicial council of which the chairmen of the judiciary committees of the house and senate are ex-officio members (no salary but are paid necessary expenses);

46-404, creating the Kansas commission on interstate cooperation of which the five members of the senate committee on interstate cooperation and the five members of the like house committee are made members. No provision is made as to salary or expenses;

And see 46-301 *et seq.* and 46-401 *et seq.* for other instances where members of the legislature are ex-officio members of councils or boards created;

76-201 *et seq.*, creating a committee to investigate complaints of official misconduct for which five members of the legislature are to be appointed and to receive the per diem and mileage they would be entitled to during the session of the legislature.

And the following instances may be found in G. S. 1953 Supp.:

74-4301 *et seq.*, creating the motor vehicle reciprocity commission of which the chairmen of named committees of the legislature are made ex-officio members and to receive actual expenses but no compensation for services;

75-3601 *et seq.*, creating the state office building commission to which only members of the legislature shall be appointed, and omitting provisions as to expiration of term, they shall not be entitled to any compensation "during any regular or special session of the legislature";

75-3708, creating the state finance council consisting of six members including the president *pro tem* of the senate, the speaker of the house and the chairmen of the ways and means committees of the senate and the house, who shall be compensated for time spent in attendance at meetings at the rate of twenty dollars per day and actual traveling and necessary expenses in attending meetings.

In *McAllister v. Fair*, 72 Kan. 533, 84 Pac. 112, 115 Am. St. Rep. 233, 3 L. R. A. n.s. 726, this court was asked to declare as a matter of public policy that a husband who had killed his wife could not inherit her estate. There was no statute that so provided. In refusing to do so, the court said, in part:

"The right to determine what is the best policy for the people is in the

legislature, and courts cannot assume that they have a wisdom superior to that of the legislature and proceed to inject into a statute a clause which, in their opinion, would be more in consonance with good morals or better accomplish justice than the rule declared by the legislature. It has been said that 'the well-considered cases warrant the pertinent conclusion that when the legislature, not transcending the limits of its power, speaks in clear language upon a question of policy, it becomes the judicial tribunals to remain silent.' (*Malinda Deem et al., v. Thomas Millikin et al.,* 6 Ohio C. C. 357, 360.)" (1. c. 536)

In the recent case of *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934, it was held:

"The declaration of public policy is primarily a legislative function though courts have authority to declare a public policy which already exists and to base its decisions upon that ground, but in absence of a legislative declaration before courts are justified in declaring existence of public policy it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt."

It has been repeatedly held that questions of public policy are for legislative and not judicial determination, and where the legislature does so declare, and there is no constitutional impediment, the question of the wisdom, justice or expediency of the legislation is for that body and not for the courts (see West's Kan. Dig., Const. L. § 70 (3) and Hatcher's Kan. Dig., Const., L. § 31).

The State's contention that the act constitutes an unauthorized attempt to confer executive power upon members of the legislature is not extended further than to the appointment of two of its committee chairmen as ex-officio members of the Authority. While the legislature cannot interfere with nor exercise any powers properly belonging to the executive, it may engage in activities which may properly be regarded as incidental to and within the scope of its legislative duties, and it is not an encroachment on the executive for the legislature to create a commission and to designate its members to perform delegable legislative duties. See 16 C. J. S. pg. 332, *et seq.* A power of appointment is not an exclusive function of the executive, nor has it ever been so considered. The above statutes and many others that could be cited demonstrate it has not been so considered, and if it were fully so this court would be without authority to appoint its own clerk and reporter. Insofar as the State's argument that the salary of a legislator is increased beyond constitutional limitations is concerned, it is observed that the compensation paid is not connected with any duty those named persons

have as members of the legislature, but is for the performance of administrative duties as members of the Authority.

We are of the opinion the contention made under this heading cannot be sustained.

### V.

Does the act violate Art. II, §§ 16 and 24 of the constitution for the reason 68-2018 is an appropriation matter not covered by the title of the act as required by Sec. 16 and purports to make an appropriation for a longer period than two years as prohibited by Sec. 24?

The above constitutional provisions cover that no bill shall contain more than one subject, which shall be clearly expressed in its title and that no money shall be drawn from the treasury except in pursuance of a specified appropriation made by law and no appropriation shall be for a longer term than two years. The basis for the short argument made by the State seems to be that the title of the act does not indicate an appropriation and that an appropriation is made by the act (68-2018) for a longer term than two years. Abruptly stated this contention is not good in any of its parts. As previously pointed out the above section of the act states that to provide for preliminary expenses of the Authority in carrying out the act the legislature shall not appropriate any moneys from the state general fund but shall appropriate such amounts as it may deem necessary not exceeding $25,000 per year for any one fiscal year from the state highway fund to be reimbursed when bonds are issued by the Authority. Assuming necessity therefor, the title of the act includes: "providing for the preliminary expenses of the authority." That is sufficient. Insofar as any appropriation is concerned it is first observed that any funds of the state highway commission are not raised by or the result of general taxation but are the fruits of levy of special taxes for road and highway purposes under statutes enacted in accord with Art. XI, § 10 of the constitution, all of which are under the general jurisdiction of the legislature for distribution and use for constitutional purposes as it may determine. That such a purpose is to be served is not debatable.

The language of the section does no more than outline a policy to be pursued and in and of itself makes no appropriation whatever. (See *State, ex rel., v. State Highway Comm.,* 138 Kan. 913, 916, 28 P. 2d 770.) The appropriation was made by Laws of 1953, Ch. 38, Item 41, wherein the legislature appropriated to the Authority to carry out the provisions of "section 18 of senate bill No.

63" "from the state highway fund" the sum of $25,000 for the fiscal year ending June 30, 1954, and a like sum for the following year. The section of the act under consideration does not pretend to make an appropriation for a longer term than two years nor out of any fund raised by general taxation, and the statute actually making the appropriation did not do so. And see comment under Title I that the matter of appropriation has been retained by the legislature.

The State's contention under this title is not sustained.

## VI.

Does the act violate Art. II, § 16 in that the subject matter of the act is broader than the title?

The State's contention under this title is in a sense supplementary to the contention discussed under Title V. After quoting the section of the constitution that no bill shall contain more than one subject which shall be clearly expressed in its title, the State says it is obvious from reading the title that the reader is not placed on notice of the fact that the state highway commission is involved in any way in the subject matter of the act or that the act relates in any way to the use of funds raised by taxation. No authority is cited in support of the contention. A review of our many decisions bearing on the titles of acts and the subjects of legislation covered is unnecessary. Certain principles applicable here include that the constitutional provision above should not be construed narrowly or technically to invalidate proper and needful legislation (*Philpin v. McCarty*, 24 Kan. 393) and that where the subject of the legislation is germane to other provisions, the act is not objectionable as containing more than one subject or as containing matter not expressed in the title. (*State, ex rel., v. Beggs*, 126 Kan. 811, 271 Pac. 400.) In *Hawkins v. Social Welfare Board*, 148 Kan. 760, 84 P. 2d 930, it was contended an act violated the above constitutional provision for the reason a provision as to liens on property of the recipient of old age assistance was not included in the title. It was said the lien feature was germane to the legislation and the title was sufficient. As has been noted on occasion, while the title of the act is more in detail than necessary, it is not misleading. It is true that while the name of the state highway commission is not included in the title, there is explicit statement of "providing for the preliminary expenses of the authority." Such a provision is made in the act and that it is germane to the other pro-

visions is too clear for argument. Without further comment we hold that the State's contention cannot be sustained.

## VII.

Does the act violate Art. XI, § 1 of the constitution in purporting to exempt any turnpike project and bonds issued under the act, their transfer and the income therefrom from taxation within the state?

The above constitutional provision, which need not be quoted, states generally that the legislature shall provide for a uniform rate of assessment and taxation, except that named property and notes and other evidence of indebtedness may be classified and taxed uniformly as to class as the legislature shall provide, and that property used exclusively by named bodies shall be exempt. The argument runs that the attempt to confer tax exemption is unconstitutional because under the act the Authority is empowered to build a highway from Kansas City to Wellington which is not and cannot be of general benefit to the people of the state and by its nature benefits only the sections of the state through which it passes, and is not presently a part of the state highway system. No authority is cited in support of what seems to us to be an argument having nothing to do with exemption from taxation. Insofar as the turnpike projects are concerned, it seems obvious that the Authority cannot, as one project, construct every turnpike which it may be feasible to construct now or in the future, or if that could be done there would be such a project or a series of projects that every citizen of the state would reside in close proximity thereto. An act is not to be denounced because every resident of the state will not receive an immediate benefit. The act is so framed that if the necessary factors as to use and income can be established and the project financed within the terms of the act a project may be constructed at any place in the state. Insofar as exemption from taxation of turnpike revenue bonds held by an individual is concerned, consideration is entirely anticipatory. No bonds have been issued, and no question concerning exemption from taxation is now before us. But as bearing on exemption from taxation of similar bonds see *State, ex rel., v. Kansas Armory Board,* 174 Kan. 369, syl. # 2, 256 P. 2d 143. In any event notwithstanding the act does not contain a separability clause, it is clear that constitutionality of the remaining portions of the act would not be affected whether the exemption obtains or does not. The contention as made is not sustained.

## VIII.

Does the act violate Art. XII, § 4 of the constitution by improperly permitting the vacation or relocation of public roads without prior provision for the payment of damages and costs and by authorizing the taking of immediate possession of property condemned?

The State contends the act violates the above section of the constitution which provides that no right of way shall be appropriated to the use of a corporation until compensation therefor shall be first made or secured by deposit of money to the owner. It is argued that as the Authority has no power of taxation there can be no assurance of payment of compensation for lands taken for the statutory purposes which include acquisition of right of way and change of location of a portion of any public highway, restrictions on the power of change of location being of no present importance. An exhaustive answer to the contention would lead us somewhat afield. Generally it may be said that under 68-2006 lands may be purchased "solely from funds provided under the authority of this act" and if a price cannot be agreed upon, or other specified conditions exist, the Authority is empowered to acquire by condemnation the requisite lands, all such proceedings and compensation to be paid to be in manner provided by the laws of the state which relate to condemnation or the exercise of the power of eminent domain, provided that the title to any property condemned by the Authority shall immediately vest and it shall be entitled to immediate possession upon deposit with the clerk of the court where the proceeding originates of the total amount of the appraised property and court costs and appraisers' fees. Provisions for appeal are not now noticed. Under the act as a whole it is abundantly clear that after the initial proceedings have been had and determination has been reached to construct a project, there can be no actual commencement of construction including acquisition of right of way until the necessary revenue bonds have been issued and sold and that funds will be in hand to defray awards and costs in connection with condemnation proceedings, and that this must be the case is deduced from the statutory provisions as to purchase or condemnation which show that purchase can only be made from funds provided by the act and that possession of lands condemned can be taken only after the appraisement, court costs, and appraisers' fees have been paid into court. Possession of real property taken

by condemnation cannot be had until the landowners' money is in court, and the State's contention as made cannot be sustained.

### IX.

Does the act violate Section 1 of the bill of rights of the constitution as permitting the taking of property without due process of law?

Under the above heading the State quotes the section of the bill of rights mentioned and also 68-2020 imposing a penalty against a person who uses any turnpike project and fails or refuses to pay the toll provided, and directs our attention to *Britt v. City of Wilmington,* 236 N. C. 446, 73 S. E. 2d 289, which the State says holds that a regulation adopted in connection with and in furtherance of an undertaking which is purely proprietary in nature may not be enforced by a criminal prosecution. No further argument is made by the State and we are somewhat at a loss to learn what it relies on to support its contention of unconstitutionality.

An examination of the above case discloses that it was an action to restrain issuance of parking facility revenue bonds in which space was devoted to whether particular activities were done in a governmental or proprietary capacity, and in which it was said that the criminal processes of the state were available to the city only for the better enforcement of the criminal law and police regulations adopted in furtherance of its functions as a governmental agency of the state, and that a regulation adopted in connection with and in furtherance of an undertaking which is purely proprietary in nature may not be enforced by criminal prosecution. Granting that such a distinction has any merit under our jurisprudence we refuse to now conclude that a turnpike project and its use as contemplated under the act in question are purely proprietary in nature. In any event the inclusion of the penalty section does not destroy the entire act and we do not sustain the State's contention.

### X.

Does the act violate Art. XII, § 1, in that it is a special act conferring corporate power?

The State's argument under this title is that the turnpike to be constructed is for the purpose of providing a connecting link to the highways of states to the east of Kansas and to constitute a part of a proposed transcontinental highway, and by its very nature the benefits are limited to the area served by the turnpike and, in

effect the act constitutes legislation which is local and special and being special legislation, corporate power may not be conferred. In support the State cites only *Barker v. Kansas City,* 149 Kan. 696, 88 P. 2d 1071. In that case this court considered a statute pertaining to the establishment of parking lots, which by a classification made applied only to Kansas City, and which provided that at a date fixed, about two years after the statute was effective, no bonds could be issued. Without analyzing the opinion, it was held that by reason of limitations made, the legislation was special, and being special no corporate power could constitutionally be conferred on the city.

In *Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530, the court considered whether a flood control act was special legislation because of language in the body of the act restricting operation to any county of the state traversed or touched by the Arkansas River. Without repeating what is said in that case, under analogies to be drawn therefrom, the instant act does not constitute special legislation.

Neither the title to the present act nor anything contained therein is restrictive. The powers therein granted are state-wide and may be exercised at any place in the state or between any locations in the state where preliminary statutory tests are met and the project is feasible thereunder. If this were a case where a taxpayer was objecting because he received no benefit, some discussion would be necessary but that is not the case, for under the statute only the users of the toll road project must contribute to its cost. And see the comment under Title VII.

In our opinion the act may not be denominated as special legislation and we need not discuss the extent to which it confers corporate power.

## XI.

Although expressly denying constitutionality of the act under attack, the State contends that if it is constitutional the actions and proposed actions of the Authority are beyond the scope of the powers granted. It may be noted that under 68-2004 the Authority is granted power to adopt bylaws and it has done so and a copy of them is attached to the petition. We have heretofore pointed out that the wisdom, justice, and expediency of the legislation is not for judicial determination. See comment under Titles I and IV. Specific action of the Authority in the future may give rise to a

matter for determination by the court but any discussion at this time is abstract and we are not disposed to place the court in a position of monitoring the actions of the Authority or of supervising or controlling the exercise of its administrative duties. The matter of the sale of revenue bonds in such manner as the Authority may determine is covered by statute and by what has been said above. Whether the title to any lands that may be condemned for right of way is vested in the Authority or the state is at present academic. The right of the Authority to fix rates of compensation of its employees is granted by the statute and presents no question of an *ultra vires* act. At the present time we have no question before us as to placing motor fuel filling stations on a right of way yet to be acquired. If the express terms of the statute as to the number of such stations is violated, an action may then be commenced to enforce compliance with 68-2009 of the act. And any question whether under 68-2010 only one trustee may be appointed is premature.

---

A review of the entire record convinces this court that the prayer of the petition should be denied and that judgment should be for the defendant and it is so ordered.