Stegall, J.,
concurring: I concur with and join the portion of todays decision concerning Judge Solomon’s standing to bring this declaratory judgment action. But I cannot join the portion of this opinion dedicated to deciding the merits of Judge Solomon’s claims. While I concur in the result of today’s decision—I too find that K.S.A. 2014 Supp. 20-329 violates the structural separation of powers dictated by our constitution—I write separately because, unfortunately, the decision of the majority does little to restore the proper sequestering of the three great governmental powers within their respective departments.
To the contrary, a majority of the court has today recapitulated a jurisprudence more properly described as promoting a “harmony of powers” than a separation thereof. It is true, we have rejected a specific mixing of powers. But we have left undisturbed and un-criticized legislative acts (such as creating a judicial position with additional duties and additional pay) that are, while perhaps more felicitous to judicial interests, equally offensive to the separation of powers. In so doing we demonstrate that we will look askance at such mixing only when it comes at the expense of cherished departmental powers.
Introduction
“Something there is that doesn’t love a wall / That wants it down,” observed Robert Frost, blaming nature’s assault—winter’s “frozen ground swell.” Robert Frost, Mending Wall, in North of Boston 11-13 (1917). As with nature, so too with governments. There is something about power that doesn’t love a wall; that wants it down. It is in the centripetal nature of governmental power—if dispersed like so many iron filings across a surface—to be restless until it is united
*535 in one place, as though drawn by an unseen magnet beneath. See, e.g., James Madison, The Federalist No. 51, p. 321 (C. Rossiter ed. 1961) (warning against the “gradual concentration of the several powers in the same department” of government).
Knowing this—and having a healthy fear of consolidated power—the drafters of both our national and our state constitutions structured our government to be crisscrossed by numerous “walls of separation.” The most important of these walls of separation are those that both hem in and protect the exercise of the three distinct forms of governmental power in our constitutional system—the executive, the legislative, and the judicial powers.
This “separation of powers” that divides our three co-equal departments of government—while nowhere explicitly set forth in the United States or Kansas constitutions—has been variously described as “inherent,” “integral,” and “firmly entrenched in United States and Kansas constitutional law.” See Solomon v. State, slip op. at 18-19; see also James Madison, The Federalist No. 47, p. 301 (C. Rossiter ed. 1961) (“No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty than [the separation of powers]. . . . The accumulation of all powers, legislative, executive, and judiciary, in the same hands,... may justly be pronounced the very definition of tyranny.”). But as Frost understood, walls fall down. And within our constitutional system, it is the duty of the courts to not only stand guard over the integrity of our governmental walls of separation, but also, as time and neglect may require, to rebuild them.
A Short Review of Our hoth Century Separation of Powers Jurisprudence
In the decades following statehood, this court routinely adhered to a principle of strict separation of powers as illustrated by our turn-of-the-centuiy decision in State v. Johnson, 61 Kan. 803, 60 P. 1068 (1900). In Johnson, we struck down a legislative conferral upon the judiciary of the legislative power to set railroad rates, holding that “the functions of the three departments should be kept as distinct and separate as possible, except so far as tire action of one is made to constitute a restraint upon the action of the *536 other.” 61 Kan. at 814. The remainder of the century would not prove so solicitous to our constitutional structure.
By the 1950s, this court was regularly refusing to strike down governmental combinations of power in one place, often in the name of what was “practicable.” See, e.g., State, ex rel., v. City of Topeka, 176 Kan. 240, 245, 270 P.2d 270 (1954) (upholding an act granting power to cities to acquire real estate for off-street parking by eminent domain on the grounds that “‘the absolute independence of the departments and the complete separation of the powers is impracticable, and was not intended’ ”) (quoting In re Sims, 54 Kan. 1, 11, 37 P. 135 (1894) [Johnston, J., concurring]); State, ex rel., v. Fadely, 180 Kan. 652, 695-96, 308 P.2d 537 (1957) (upholding an act creating die State Finance Council, holding “it cannot be overlooked as a practical matter that as between die legislative and the executive departments of our government die enactment contemplates comity and cooperation and not a blending of powers”).
By 1976, our new practical approach to determining when a government combination of power had become too great dictated that we create a legal test, and in State, ex rel, v. Bennett, 219 Kan. 285, 547 P.2d 786 (1976), we settled on a four-factor test—the same test the majority applies today—intended to establish whether any specific combination created a “significant interference” with the independent function of any department of government. Along the way, we stated:
“Although the theoretical separation of powers of government was strictly enforced in our early history without qualification, the more recent cases have modified the doctrine and applied a more practical approach.. . .”
“In our judgment a strict application of the separation of powers doctrine is inappropriate today in a complex state government where administrative agencies exercise many types of power including legislative, executive, and judicial powers often blended together in the same administrative agency. The courts today have come to recognize that the political philosophers who developed the theory of separation of powers did not have any concept of the complexities of government as it exists today. Under our system of government tire absolute independence of the departments and tire complete separation of powers is impracticable. We must maintain in our political system sufficient flexibility to experiment and to seek new methods of improving governmental efficiency.” Bennett, 219 Kan. at 288-89.
*537 A few years later, we reiterated:
“[A]n entire and complete separation is [n]either desirable [n]or was ever intended by the framers of the Constitution. The fact that the powers of one department may overlap with another department’s powers has long been a recognized fact. Throughout tire judicial history of this state early decisions attempted to apply the doctrine strictly, refusing to tolerate any overlapping of powers. State v. Johnson, 61 Kan. 803, 60 P. 1068 (1900). The more recent cases have modified the doctrine, taking a more pragmatic, flexible and practical approach giving recognition to the fact there may be a certain degree of blending or admixture of the three powers of government and that absolute separation of powers is impossible. [Citations omitted.]” State v. Greenlee, 228 Kan. 712, 715-16, 620 P.2d 1132 (1980).
Contrary to our history of casually dismissing the “theory” behind our constitutional structure, we should have paused somewhere along this path and soberly reflected that “[t]o the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution.” Perez v. Mortgage Bankers Assn, 575 U.S. _, 135 S. Ct. 1199, 1216, 191 L. Ed. 2d 186 (2015) (Thomas, J., concurring). But—in the absence of such reflection—the death blow to Johnson and our early separation of powers jurisprudence finally arrived in State v. Mitchell, 234 Kan. 185, 193, 672 P.2d 1 (1983).
In Mitchell, this court was required to determine “whether the Supreme Court has exclusive constitutional power to make rules pertaining to court administration.” 234 Kan. at 193. In deciding whether a legislative enactment dictating a rule of court procedure violated the separation of powers, the Mitchell court held that “[a] lthough the Supreme Court has the constitutional power to determine court procedure, it may cooperate with the legislature in the exercise of that power. The Supreme Court’s acquiescence [to the statute in question] is an example of cooperation.” Mitchell, 234 Kan. 185, Syl. ¶ 7. The Mitchell court followed the logic of this holding through to its inevitable conclusion, reasoning that because “the judiciaiy can acquiesce in legislative action” which dictates aspects of “the judicial function,” a “problem” only emerges “when court rules and a statute conflict”; and in “such circumstances,” the courts rule “must prevail” and the statute must give way. Mitchell, 234 Kan. at 195.
*538 Mitchell is the culmination of decades of our “straying further and further from the Constitution without so much as pausing to ask why.” Michigan v. E.P.A., 576 U.S. _, 135 S. Ct. 2699, 2714, 192 L. Ed. 2d 674 (2015) (Thomas, J., concurring). Its rule that the constitutional separation of powers can essentially be waived by the departments of government whenever they find such separation an inconvenient impediment to some sought-after governmental end misapprehends and may fatally undermine the fundamental purpose of such walls of separation in the first instance—to prevent the “gradual concentration of the several powers in the same department” which “may justly be pronounced the very definition of tyranny.” Madison, at 301.
The separation of powers contains no opt-out clause. The departments are not free to ignore the strictures of separate powers upon a mutual declaration of cooperation in furtherance of some jointly agreed upon governmental objective. And if there is such an opt out, upon what grounds other than the arbitrary whim of one department refusing to cooperate could a violation of the separation of powers ever be found? In a government founded upon and itself governed by the rule of law, the governmental departments “cannot by agreement alter the constitutional structure.” N.L.R.B. v. Noel Canning, 573 U.S. _, 134 S. Ct. 2550, 2594, 189 L. Ed. 2d 538 (2014) (Scalia, J., concurring).
K.S.A. 2014 Supp. 20-329 Does Not Violate the Four-Factor Bennett Test
However, as discussed above, our precedent has established that in Kansas the departments may in fact alter our constitutional structure so long as such alteration is not “significant.” In Bennett— relying on our dismissal of the antiquated theory of separation of powers as it was actually embedded into our constitutional structure by the drafters of our governmental charters—we established a four-part test to determine when the “flexibility to experiment” in the name of “governmental efficiency” has gone too far and created a “significant interference” with the separation of powers:
“First is the essential nature of the power being exercised. Is the power exclusively executive or legislative or is it a blend of the two? A second factor is tire *539 degree of control by the legislative department in the exercise of the power. Is there a coercive influence or a mere cooperative venture? A third consideration of importance is tire nature of the objective sought to be attained by the legislature. Is the intent of the legislature to cooperate with the executive by furnishing some special expertise of one or more of its members or is the objective of tire legislature obviously one of establishing its superiority over the executive department in an area essentially executive in nature? A fourth consideration could be the practical result of the blending of powers as shown by actual experience over a period of time where such evidence is available. Bennett, 219 Kan. at 90-91.
We thereby “replaced the clear constitutional prescription” demanding the sequestering of powers into three separate co-equal and coordinate branches “with a ‘balancing test.’” See Morrison v. Olson, 487 U.S. 654, 711, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988) (Scalia, J., dissenting). Thus, following Bennett and its progeny, in the name of balance, cooperation, and harmony, we have permitted breaches of the walls of separation between the departments so long as no single breach is determined to be “significant.” The majority today applies the four-factor Bennett test to find that K.S.A. 2014 Supp. 20-329 amounts to a “significant” interference with the judicial department and is therefore unconstitutional.
This holding, however, cannot be reconciled with the facts before us—especially in fight of our prior decisions discussed above refusing to strike down far more significant interferences. For example, in State v. Reed, 248 Kan. 792, 793, 800, 811 P.2d 1163 (1991), we upheld a statute providing “that a district court shall modify a defendants sentence when recommended by the [executive branch] unless specific findings are made by the trial court.” To reach this result, we applied the first Bennett factor and found no violation because tire judiciary retained the final discretion regarding sentence. As such, we found the essential “nature” of the power being exercised was cooperative and “advisory.” 248 Kan. at 800. Similarly, when considering the second factor, the Reed court did not find an unlawful level of control over judicial discretion but rather found that the statute merely “channels the discretionary authority of the court.” 248 Kan. at 801.
By the same token—when viewed in a fight most favorable to upholding the constitutionality of the law as the majority states it is *540 doing—K.S.A. 2014 Supp. 20-329 could reasonably be characterized as a cooperative effort to advise and channel the administrative power of the Supreme Court. After all, as the State has repeatedly pointed out, the appointment power is still being exercised entirely within the judicial branch and the actual performance of judicial administrative duties remains entirely subject to the ultimate authority of the Supreme Court. Moreover, the legislature has exercised the same fundamental control over the position of chief judge since it began requiring this court to fill that position in each judicial district. L. 1976, ch. 146, sec. 28. Simply put, todays holding cannot be reconciled with Chief Judge Solomon s concession, and this court’s implicit admission, that under the precedents of harmony, the legislature does in fact have the power to create the position of chief judge in the first instance and to assign duties of judicial administration to that position. In view of this, we today demonstrate that the standard by which we determine “significance” is simply “the unfettered wisdom of a majority of this Court.” Morrison, 487 U.S. at 712 (Scalia, J., dissenting).
This difficult judgment is unavoidable, especially in light of the manner in which the majority opinion glosses quickly over the district court’s application of Mitchell and the parties’ focus on the meaning and application of the Mitchell rule. Mitchell’s transparent elevation of judicial policy to the level of constitutional law is perhaps more easy to forget than to confront because Mitchell rather bluntly (if impolitely) asserts what actually happens in the world Bennett established—-a world in which judges “recognize” the naiveté of those who “developed the theory of separation of powers” but who had no “concept of the complexities of government as it exists today.” Bennett, 219 Kan. at 288.
By rejecting the original strictures of the constitution, the Bennett court gave to itself—and to successive generations of judges and governmental officials—’’sufficient flexibility to experiment and to seek new methods of improving governmental efficiency.” Bennett, 219 Kan. at 289. The consequences of this land of constitutional amendment by experimentation are perfectly illustrated by Mitchell’s rule that a legislative enactment dictating a matter of judicial administration is either constitutional or unconstitutional *541 depending on nothing more substantial than whether the Supreme Court agrees with the policy choices represented by the statute.
A Question of Deference
The descent of this courts separation of powers jurisprudence from Johnson to Bennett and Mitchell was aided in no small part by our application of judicial deference. We have routinely stated the rule that “[i]f there is any reasonable way to construe a statute as constitutionally valid, the court must do so.” Boatright v. Kansas Racing Comm’n, 251 Kan. 240, 243, 834 P.2d 368 (1992). We have regularly repeated this rule in separation of powers cases, and we do so again today (though I find little evidence that the majority has made an effort to construe K.S.A. 2014 Supp. 20-329 as constitutionally valid in light of the four Bennett factors). See Solomon v. State, 303 Kan. at 523.
This deferential rule and practice played a key role at the fulcrum of this particular history in this courts decision in State, ex rel., v. Fadely, 180 Kan. 652. There, in a 4-2 decision, we ruled that the legislative act creating the State Finance Council did not violate the separation of powers. The Fadely majority relied heavily on our earlier decision upholding the Kansas Turnpike Authority in State, ex rel., v. Kansas Turnpike Authority, 176 Kan. 683, 273 P.2d 198 (1954)—a case that had been brought by then Attorney General Harold Fatzer. By tire time Fadely was heard and decided, Fatzer had joined this court, and he wrote a lengthy dissent, joined by Justice Wertz, pleading for a return to the strict principles of separation of powers set forth in Johnson and other earlier cases. See generally Fadely, 180 Kan. at 668-89.
Fatzer was particularly aggrieved by the Fadely concurring opinion written by Justice Schroeder and joined by Justices Parker and Price. That concurring opinion was written specifically to push this court in the direction of what I have here called a doctrine of “harmony of powers.” Objecting to Fatzers citation of The Federalist Papers and other authority in the realm of political theory, Justice Schroeder wrote that the court “should not be overcome by the repetition of theory piled higher and higher in matters concerning the separation of powers before the facts and practical aspects of *542 the problem have been thoroughly exploited by judicial thought.” Fadely, 180 Kan. at 693.
Justice Schroeder went on to note that “it cannot be overlooked as a practical matter that as between the legislative and the executive departments of our government the enactment contemplates comity and cooperation and not a blending of powers.” Fadely, 180 Kan. at 695-96. Finally, he concluded that—contrary to Justice Fatzer’s concern that the Supreme Court was allowing “the power of one department to pour through like an on surging flood to engulf and submerge the power of another department” 180 Kan. at 668—the legislature was enacting “a cooperative proposition” and not engaged in a “usurpation of power.” 180 Kan. at 696. Recognizing that a cooperative act in violation of the constitution is no less violative for being accomplished in the name of the general good and without opposition, Justice Fatzer responded that “we are dealing with an important and far-reaching constitutional question concerning a power of government which does not permit honesty, integrity, good intentions, a progressive enthusiasm, or even successful operation to take the place of essential constitutional action.” Fadely, 180 Kan. at 688.
The Fadely concurrence relied heavily on the rule of deference to justify its dismissal of Justice Fatzer’s constitutional concerns in favor of the “practical aspects of the problem.” 180 Kan. at 693. For example, Justice Schroeder quoted from the Fatzer court’s similarly deferential posture towards “questions of public policy [which] are for legislative and not judicial determination, and where the legislature does so declare, and there is no constitutional impediment, the question of the wisdom, justice or expediency of the legislation is for that body and not for the courts.” Fatzer, 176 Kan. at 695. On a six member court split 3-2 (Justice Hall did not participate) on the substantive question before it, Justice Robb stood to cast the deciding vote. Ultimately, he concurred in the result reached by Justices Schroeder, Parker, and Price. Pie did not join their separate opinion, however, because in substance, he agreed with Justice Fatzer’s dissent, going so far as to write in his own separate opinion that “we cannot waive our constitutional provisions on the theory that even the constitution must bend to the public good.” Fadely, *543 180 Kan. at 701. Nevertheless, he explained and justified his final vote in Fadely entirely on the grounds of deference: “I would be inclined to join in the dissent were it not for that long fine of decisions of our court following the almost universal rule that an act of the legislature is presumed to be constitutional unless it contravenes an express inhibition of the constitution.” Fadely, 180 Kan. at 698.
I agree with the recitation in Fatzer that it is within the province of the legislative department to “declare”—where “there is no constitutional impediment”—the “public policy” of this state. Fatzer, 176 Kan. at 695. Moreover, the doctrine of judicial deference to the legislative power to declare policy in the form of law-making is itself a vital aspect of the doctrine of separation of powers, prohibiting as it does the judicial department from “question[ing] the wisdom, justice or expediency of the legislation.” Fatzer, 176 Kan. at 689. So while judicial deference to the exercise of legislative or executive powers is entirely meet and proper, the same deference shown to the legislative or executive departments when they act outside of their respective vested powers is, in actual fact, an abdication of the vested judicial power to say what the law is.
“We may not—without imperiling the delicate balance of our constitutional system—forgo our judicial duty to ascertain the meaning of the Vesting Clauses and to adhere to that meaning as the law.” Department of Transp. v. Ass’n of American R.R., 575 U.S. _, 135 S. Ct. 1225, 1246, 191 L. Ed. 2d 153 (2015) (Thomas, J., concurring). “[Wjhen questions involving the Constitutions government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch ‘to say what the law is.’” N.L.R.B., 134 S. Ct. at 2593 (Scalia, J., concurring) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 [1803]). Moreover, the judiciary “does not defer to the other branches’ resolution of such controversies. . . . Rather, policing the ‘enduring structure’ of constitutional government when the political branches fail to do so is ‘one of the most vital functions of this Court.’” N.L.R.B., 134 S. Ct. at 2593 (Scalia, J., concurring) (quoting Public Citizen v. Department of Justice, 491 *544 U.S. 440, 468, 109 S. Ct. 2558, 105 L. Ed. 2d 377 [1989] [Kennedy, J., concurring in judgment]).
A short look, for example, at the all-too-common habit of legislative delegation of its exclusive power to make law to the vast apparatus of tire administrative state may demonstrate the dangerous combinations of power that can grow up in the protective shadow of such judicial deference and judicial encouragement of cooperation between the departments. See, e.g., Ass’n of American R.R., 135 S. Ct. at 1246 (Thomas, J., concurring) (“Implicitly recognizing that tire power to fashion legally binding rules is legislative, we have nevertheless classified rulemaking as executive (or judicial power) when the authorizing statute sets out 'an intelligible principle’ to guide the rulemaker’s discretion. . . . [I]t is evident that [the intelligible principle test] does not adequately reinforce the Constitution’s allocation of legislative power. I would return to the original understanding of tire federal legislative power and require that tire Federal Government create generally applicable rules of private conduct only through the constitutionally prescribed legislative process.”).
Strictly Enforcing the Constitutionally Mandated Separation of Powers in this Case
Today we propagate our long-standing yet erroneous separation of powers jurisprudence. Worse, we have compounded our prior error by applying the precedent promoting “harmony” and “sharing” in such an arbitrary manner that we leave no doubt that the Bennett test for finding a “significant interference” is mere fig-leafing to cover our unsightly exercise of judicial willfulness.
I respectfully dissent from this approach because a consistent application of the four Bennett factors, colored by deferential review and in fight of our prior precedent, would require that we uphold K.S.A. 2014 Supp. 20-329 as a constitutionally permissible less-than-significant exercise of “shared” powers of judicial administration. But rather than follow flawed precedent to a result that further erodes the constitutional separation of powers, I would instead adhere to the basic principle recognized by this court in *545 Johnson that “the functions of the three departments should be kept as distinct and separate as possible.” 61 Kan. at 814.
Stating the rule as clearly and succinctly as possible, I would hold that when “the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it.” Ass’n of American R.R., 135 S. Ct. at 1241 (Thomas, J., concurring). This does not mean there can never be close or difficult cases in this arena, however, because some “functions maybe performed by two or more branches without either exceeding its enumerated powers under the Constitution. . . . The question is whether the particular function requires the exercise of a certain type of power; if it does, then only the branch in which that power is vested can perform it.” Ass’n of American R.R., 135 S. Ct. at 1241-42 (Thomas, J., concurring).
Furthermore, I would return this court to the active judicial role and obligation to guard and protect a clear and strong wall of separation between each of the three great departments of government—keeping each within its proper province and protecting those provinces from colonization by the other two departments. It is within the judicial province to carefully exercise this power without deference to the other branches, and it is the duty of our department to carry out this obligation without regard to whether the results are perceived to be either beneficial or detrimental to judicial interests or other sub-constitutional interests such as what we (or any other government official) decide is “practicable” or “efficient.”
Following diese principles, I have no difficulty whatsoever concurring with the result reached by the majority today. Our constitution expressly and unambiguously dedicates the power to administer the judicial branch to the Supreme Court. Kan. Const. art. 3, § 1. This power to administer cannot be shared and is exclusively part of the judicial power in this state. Deciding who, within any particular judicial district, shall be the chief administrative officer is plainly within the administrative power granted to the Supreme Court.
*546 Therefore, the exercise of legislative power to control or dictate in any manner the exercise of judicial administration cannot survive constitutional scrutiny. See Wellness Int’l Network, Ltd. v. Sharif, 575 U.S. _, 135 S. Ct. 1932, 1962, 191 L. Ed. 2d 911 (2015) (Thomas, J., dissenting) (“[Ejven when acting pursuant to an enumerated power” the legislature “exceeds its authority when it purports to authorize a person or entity to perform a function that requires the exercise of a power vested elsewhere.”). This conclusion necessarily encompasses not just K.S.A. 2014 Supp. 20-329 setting forth the manner of appointment of chief judges, but also the creation of the position of chief judge, L. 1999, ch. 57, sec. 17, the assignment of administrative duties to the chief judge, L. 1976, ch. 146, sec. 28; L. 1999, ch. 57, sec. 17, and the conferral of benefits on the chief judge, K.S.A. 2014 Supp. 75-3120g.
Conclusion
To any who may complain (either today or at a later time when some other ox is being gored) that the strict sequestering of governmental power here proposed is unworkable in todays complex society—impractical; inefficient; subject to abuse; or antiquated— we must respectfully answer with the “truism that constitutional protections have costs.” Coy v. Iowa, 487 U.S. 1012, 1020, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). “A system of separate and coordinate powers necessarily involves an acceptance of exclusive power that can theoretically be abused. . . . While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty.” Morrison, 487 U.S. at 710-11 (Scalia, J., dissenting).
At the end of the day, this is the fact that cannot—must not—be forgotten. Constitutional limits enforced under the protective umbrella of the rule of law derive their ultimate authority from the political power of the people and exist for the protection and propagation of liberty under the law. Each department of government has been vested with unique and exclusive powers to effectuate orderly government—and each has a coordinate and co-equal obligation to exercise its powers with due respect for the powers vested in tire other branches. “The Judiciary—no less than the other two branches—has an obligation to guard against deviations from those *547 principles.” Perez, 135 S. Ct. at 1217 (Thomas, J., concurring). Anything less threatens liberty with the specter of dangerous combinations of power-—the prevention of which remains vital to the future of constitutional government.